IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 08-00159 SOM |
| | ) | |
| Plaintiff, | ) | ORDER DENYING DEFENDANT MARIO |
| | ) | TUUA'S MOTION TO DISMISS |
| vs. | ) | INDICTMENT OR, IN THE |
| | ) | ALTERNATIVE, TO SUPPRESS |
| MARIO TUUA, | ) | EVIDENCE |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

ORDER DENYING DEFENDANT MARIO TUUA'S MOTION TO DISMISS
INDICTMENT OR, IN THE ALTERNATIVE, MOTION TO SUPPRESS EVIDENCE

I.      INTRODUCTION.

On March 13, 2008, Defendant Mario Tuua was indicted on
one count of possessing a firearm and ammunition as a felon in
violation of 18 U.S.C. § 922(g)(1), one count of possessing with
intent to distribute an illegal substance in violation of 21
U.S.C. § 841, and one count of carrying a firearm during and in
relation to a drug trafficking crime in violation of 18 U.S.C.
§ 924(c)(1)(A).

Tuua moves to dismiss the Indictment or, in the
alternative, to suppress all evidence recovered from the search
of a black bag and of Tuua himself by the Honolulu Police
Department ("HPD"), as well as statements he made to HPD after
his arrest.  Tuua argues that there is no probable cause to
sustain the Indictment, that HPD lacked any reasonable suspicion
to perform an investigatory stop, that Tuua's abandonment of the
black bag was not voluntary because it was the product of an

illegal stop, and that his statements should be suppressed
because no <u>Miranda</u> warnings were given.  The Government claims
that (1) there is no legal basis for dismissing the Indictment
based on an alleged lack of probable cause; (2) reasonable
suspicion supported HPD's investigatory stop of Tuua; (3) Tuua
does not have standing to challenge the search of the black bag
because it was voluntarily abandoned; and (4) the search of Tuua
was a valid search incident to arrest.

     The court concludes that (1) there is no legal
authority for dismissal of the Indictment for an alleged lack of
probable cause; (2) there was no investigatory stop of Tuua
before he abandoned the bag, so his abandonment of the bag was
voluntary; (3) there was probable cause to arrest Tuua; (4) no
<u>Miranda</u> warnings were required because there was no custodial
interrogation; and (5) the search of Tuua was a valid search
incident to his arrest.  Accordingly, Tuua's motion to dismiss
the Indictment or, in the alternative, to suppress evidence is
denied.

II.      <u>FINDINGS OF FACT.</u>

     This court makes the following findings of fact by a
preponderance of the evidence.  The findings are set forth in
numbered paragraphs for ease of future reference.

      1.  This court has before it five exhibits submitted
by Tuua: (1) an Initial Report submitted by HPD Officer Sellers

on March 8, 2008 ("Ex. A"); (2) a Follow Up Report submitted by HPD Officer Derek Yamamoto on March 8, 2008 ("Ex. B"); (3) a Follow Up Report submitted by HPD Officer Scott Nakasone on March 8, 2008 ("Ex. C"); (4) a blown-up copy of a diagram of the area around River Street and North Kukui Street with notations made by witnesses ("Ex. D"); and (5) a drawing prepared by Marie Green during the evidentiary hearing.  Also before the court are seven exhibits submitted by the Government: (1) a diagram of the area around River Street and North Kukui Street, not drawn to scale ("Ex. 2"); (2) a photograph of Zorro Rye ("Ex. 4"); (3) a photograph of River Street ("Ex. 5"); (4) a photograph of the black bag recovered from Nuuanu Stream ("Ex. 6"); (5) a closeup photograph of the black bag ("Ex. 7"); (6) a photograph of the items recovered from the black bag ("Ex. 8"); and (7) a photograph of items recovered from the search of Tuua ("Ex. 9").

2.  This court held an evidentiary hearing during which it received oral testimony from HPD Officer Daniel Sellers, HPD Officer Derek Yamamoto, HPD Officer Scott Nakasone, and Marie Green, who is Tuua's girlfriend.  This court found Officers Sellers, Yamamoto, and Nakasone credible on the matters to which they testified.  Green's testimony was in certain respects not credible, but, even assuming the truth of all of Green's testimony, the court would reach the same legal conclusions.

3.  On the evening of March 7, 2008, around 10:00 p.m., Green dropped Tuua off near Uptown Café.  The café is located on River Street in downtown Honolulu, Hawaii, across the street from Nuuanu Stream.  Green Testimony;[1] Ex. D.  Tuua was meeting with his cousin, "Zorro" Ramon Rye, for dinner.  Green parked her car near the intersection of River and Vineyard Streets to drop Tuua off and watched him cross the street while she waited, hoping he would return to the car to kiss her goodbye.  Green Testimony.

4.  That same evening, HPD Officer Sellers was driving an unmarked vehicle in the area around North Kukui Street and River Street.  Officer Nakasone was in the front passenger seat, and Officer Yamamoto was sitting behind the driver.  The three officers were all in plainclothes.  Sellers Testimony.  Based on his eleven years of experience with HPD, Officer Sellers considered the area to be one "known for its high volume of illicit narcotic trafficking."  Ex. A at 1; Sellers Testimony.

5.  Officer Sellers says he saw Tuua standing about thirty feet away from Officer Sellers's car, within an arm's

---

[1] In an effort to rule promptly on the merits and to avoid the burden on the court's overextended court reporters, the court did not request, and therefore does not have, final transcripts of the live testimony.  References to the testimony are based on the court's recollection and notes.  The court has reviewed the court reporter's "rough" version of the transcripts, but is unable to give exact page and line citations to any certified transcript.

length of Rye on the café side of River Street.  Sellers
Testimony.  Officer Sellers says that he saw Tuua reach into a
black bag he was carrying and give something to Rye, and that
Tuua and Rye then immediately went in opposite directions.  Based
on the time of night, the location, and what he says Tuua and Rye
did, Officer Sellers believed that Tuua was engaging in a drug
transaction.  Id.

6.  Green has a different recollection of what
happened.  She says Rye was originally on the stream side of
River Street, across the street from her car, while Tuua was near
her car, near Uptown Café.  Green Testimony; Ex. E.  As the
officers' car pulled up near Tuua, Rye crossed the street toward
Uptown Café, and Tuua crossed the street toward the side Rye had
been, near Nuuanu Stream.  Green did not explain why Tuua crossed
the street if he was near Uptown Café and planned to go to dinner
with Rye, but she recalled that the closest Tuua and Rye got to
each other was approximately one car length.  Green Testimony.

7.  Officer Sellers told Officers Nakasone and
Yamamoto that a drug transaction had occurred, then slowed his
car to a stop near Tuua.  Sellers Testimony; Yamamoto Testimony.
Officer Yamamoto, who had been watching a different area, did not
see the alleged drug transaction.  Yamamoto Testimony.  Officer
Sellers intended to "eventually" stop Tuua to investigate, but he

never told the other officers that this was his plan.  Id.;
Sellers Testimony; Nakasone Testimony.

        8.   When the officers got out of their car, Tuua was
walking away from them and crossing the street toward Nuuanu
Stream.  Yamamoto Testimony.  The officers claim they said
nothing to Tuua.  Id.; Sellers Testimony; Nakasone Testimony.
Green, however, says that the officers shouted twice to Tuua to
"come here."  Green Testimony.  Officers Sellers and Yamamoto
followed Tuua from a distance of approximately twenty to thirty
feet as Tuua continued to walk away from them.  Yamamoto
Testimony.  Meanwhile, Officer Nakasone focused on following Rye.
Nakasone Testimony.

        9.   Officer Sellers says Tuua reached into his bag,
which Officer Sellers thought might contain a weapon.  Officer
Sellers accordingly lifted his shirt to make his own gun readily
available, an action Tuua probably did not see because he was in
front of and not facing Officer Sellers at the time.  Sellers
Testimony.  As Tuua walked toward a two-foot wall bordering
Nuuanu Stream, he clutched his bag in his right hand, then swung
the bag and threw it into the stream with an underhand motion.
Id.

        10.  Tuua quickened his pace, while Officers Sellers
and Yamamoto went to look into the stream for the black bag.
Id.; Yamamoto Testimony.   Officer Sellers saw the bag about

fifteen to twenty feet away from the wall; it was the only bag he saw in the stream.  Sellers Testimony.  Officers Sellers and Yamamoto then ran toward Tuua, yelling "Police, stop!"  Id.; Yamamoto Testimony.  This was the first time they had identified themselves to Tuua as police officers.  Sellers Testimony; Green Testimony.  Based on what he saw Tuua and Rye do together and on the throwing of the bag into the stream, Officer Sellers suspected Tuua had committed a crime.  Sellers Testimony.  He also viewed the throwing of the bag into the stream as constituting the petty misdemeanor of littering.  Id.

11.  When Tuua did not stop in response to the officers' instruction, Officer Sellers grabbed Tuua around the shoulders.  Tuua fell forward in what Officer Sellers thought was the result of Tuua's tripping over a nearby bicycle.  Part of a bicycle is visible in Exhibit 5.  Officer Sellers also fell when Tuua fell.  Id.; Yamamoto Testimony.  Officer Yamamoto then helped Officer Sellers subdue Tuua.  The officers say that neither struck Tuua, although Officer Sellers did place his knee on Tuua's shoulder to take hold of Tuua's arm.  Id.  By the time Officer Nakasone got to the other two officers, Tuua had been subdued.  Officer Nakasone says he did not strike Tuua.  Nakasone Testimony.

12.  Green's account again differs from the officers'.  Green says that three officers attacked Tuua and knocked him to

the ground.  They allegedly struck, kneed, punched, kicked, and swore at Tuua.  Green Testimony.  Green says that seeing the officers attack Tuua made her concerned for her own safety, so she moved her car to turn a corner and park it on Vineyard Street.  Id.  Green says that she then returned to where Tuua was, and that ten to twelve bystanders were also in the area. She called Rye (presumably using a cell phone) to ask if he knew what was going on.  She says she deliberately did not call the police to report the alleged beating by police officers.  The record does not establish whether Green or Rye had a cell phone that included a camera, or whether any bystander had such a cell phone.  What it clear is that no photograph or videotape showing the alleged beating was submitted to the court.

13.  The court questions whether Green would really have driven away from the alleged beating to park her car.  She testified she had no inkling that Tuua was carrying drugs or a gun.  If that was so, she presumably thought the police were randomly beating her boyfriend.  That she let her boyfriend be beaten without even asking the many bystanders for help was not only heartless, it is not credible.

14.  Notably, Green said she did not later ask the attorney she works for as a paralegal to help her or Tuua in connection with the alleged beating.  She says she only told her boss that her boyfriend had been arrested.  Green had previously

8

been a paralegal for many years with a different attorney, but
there is no evidence she sought help from her former boss either.
Id.  The court cannot help but question whether Green actually
saw the officers beat Tuua.  Someone who has been a paralegal for
a decade could be expected to seek advice or assistance from an
attorney she worked with or knew well if alleged police brutality
occurred in her presence, especially if she has already told that
attorney that her boyfriend was arrested.  Once the arrest was
disclosed, the court is hard-pressed to think that shyness or
privacy concerns would cause a paralegal not to describe alleged
wrongdoing by the arresting officers.  While Green's boss
specializes in admiralty law, not police brutality, Green
certainly could have reasonably expected either advice from her
boss or at least a referral by her boss to another lawyer.  In
short, Green's description of the alleged beating is not
credible.

            15.  Officer Nakasone contacted the Honolulu Fire
Department ("HFD") for assistance in retrieving the black bag
from the stream.  Sellers Testimony.  Officer Sellers was
concerned about going into the stream himself because he
considered the stream to be polluted.  Id.  Officer Asato climbed
down to the stream in an attempt to retrieve the bag.  The
officers saw that water was getting into the bag and were

                              9

concerned that the contents would be destroyed before HFD arrived.  Id.

16.   A civilian bystander, Mr. Diaz, offered to enter the water and retrieve the bag for Officer Asato.  Officer Nakasone says he did not see any HPD officer solicit any bystander's help in retrieving the bag, see Nakasone Testimony, but Green says that the officers offered four hundred dollars to anyone who retrieved the bag.  Green Testimony.

17.   Apparently because the officers accepted Diaz's offer to do that which they themselves declined to do, Diaz walked into the water, got the bag, and handed it to Officer Asato by its shoulder strap.  Officer Sellers said Diaz did not touch the contents of the bag before handing it to Officer Asato. Sellers Testimony.  The officers say HPD did not pay Diaz for retrieving the bag.  Id.; Nakasone Testimony.  Green counters that, although she did not see Diaz get paid, she heard that he was paid.  Green testimony.

18.   Officer Asato took the bag to Officer Sellers and placed it on the sidewalk.  Shining his flashlight into the bag, Officer Sellers saw the slide of a silver metallic semiautomatic handgun in a "ready position."  Sellers Testimony.  Also in the bag were a scale and two brown paper bags, one containing a large sum of currency, the other with two clear cellophane bags

containing a white substance that Officer Sellers thought was crack cocaine.  Id.; Ex. A at 4; Exs. 6-8.

19.  Officer Sellers arrested Tuua for "place to keep" a firearm and for promoting dangerous drugs.  Sellers Testimony; Ex. A at 4.  None of the officers questioned Tuua.  Tuua, however, spontaneously told the officers that he knew about another individual who had thrown a bag of narcotics into a stream.  Tuua said that the bag was retrieved by a private individual named Bonsai, and that the individual who discarded the bag then "beat the case" against him.  Sellers Testimony.

20.  Officer Sellers asked Officer Alapa to search Tuua.  Ex. A at 4.  Officer Alapa found several white rocklike objects resembling crack cocaine and two stacks of currency on Tuua.  Id.; Ex. 9.

III.   CONCLUSIONS OF LAW.

A.   There is No Legal Basis for Dismissing the Indictment Based on A Lack of Probable Cause.

1.  Rule 12(b) of the Federal Rules of Criminal Procedure allows the consideration at the pretrial stage of any defense "which is capable of determination without the trial of the general issue."  United States v. Nukida, 8 F.3d 665, 669 (9th Cir. 1993).  A motion to dismiss is generally "capable of determination" before trial if it involves questions of law rather than fact.  Id.  Although the court may make preliminary findings of fact necessary to decide legal questions presented by

a motion, the court may not "invade the province of the ultimate finder of fact." Id.  "In considering a motion to dismiss, a court is limited to the face of the indictment and must accept the facts alleged in that indictment as true." United States v. Ruiz-Castro, 125 F. Supp. 2d 411, 413 (D. Haw. 2000).

2.  An indictment is only required to "be a plain, concise and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  An indictment will withstand a motion to dismiss if it contains the elements of the charged offense(s) in sufficient detail (1) to enable the defendant to prepare his or her defense; (2) to ensure the defendant that he or she is being prosecuted on the basis of the facts presented to the grand jury; (3) to enable the defendant to plead double jeopardy; and (4) to inform the court of the alleged facts so that it can determine the sufficiency of the charge.  United States v. Rosi, 27 F.3d 409, 414 (9th Cir. 1994); United States v. Bernhardt, 840 F.2d 1441, 1445 (9th Cir. 1988).

3.  A defendant may not properly challenge an indictment, sufficient on its face, on the ground that the allegations are not supported by adequate evidence.  Therefore, a motion to dismiss an indictment may not be used as a device for summary trial of the evidence.  United States v. Jensen, 93 F.3d 667, 669 (9th Cir. 1996).

12

4.  This court, however, may make preliminary findings of fact when necessary to decide a question of law presented by a pretrial motion so long as the findings do not invade the province of the ultimate finder of fact.  United States v. Shortt Accountancy Corp., 785 F.2d 1448, 1452 (9th Cir. 1986).  Of course, when the pretrial motion is substantially founded upon and intertwined with disputed evidence, the motion falls within the province of the ultimate finder of fact.  Id.

5.  Tuua does not dispute the sufficiency of the Indictment, arguing only that there was no probable cause to arrest Tuua.  Because this argument is founded on factual issues, it cannot form the basis of a dismissal of the Indictment on this motion.  The grand jury found probable cause to indict Tuua, and this court may not override the grand jury by granting Tuua's motion to dismiss the Indictment for lack of probable cause.  That motion is denied.

B.  Tuua Voluntarily Abandoned the Bag Because HPD Did Not Stop Tuua Before He Abandoned the Bag.

1.  The Government argues that Tuua does not have standing to challenge the search of the bag because Tuua abandoned the bag.  The court agrees.

2.  Standing is determined by examining whether the individual has a "legitimate expectation of privacy in the invaded space."  Rakas v. Illinois, 439 U.S. 128, 143 (1978).  When a person has abandoned property, he has no standing to

13

challenge the search or seizure of the abandoned property.
United States v. Jackson, 544 F.2d 407, 409 (9th Cir. 1976).

        3.  "[A]bandonment is a question of intent.  The
inquiry should focus on whether, through words, acts or other
objective indications, a person has relinquished a reasonable
expectation of privacy in the property at the time of the search
or seizure."  United States v. Nordling, 804 F.2d 1466, 1469 (9th
Cir. 1986).  This court looks at the totality of circumstances
when determining abandonment.  Of particular significance is
whether there has been "denial of ownership and physical
relinquishment of the property."  Id.  The Government has the
burden of establishing abandonment.  See United States v.
Fernandez, 772 F.2d 495, 499 (9th Cir. 1985).

        4.  It is undisputed that Tuua tossed his black bag
into the stream and maintained no control over the bag.  The
court concludes that Tuua abandoned the bag and therefore lacks
standing to challenge its search.  In United States v. Mendia,
731 F.2d 1412 (9th Cir. 1984), the Ninth Circuit affirmed the
district court's conclusion that the defendant had "abandoned his
reasonable expectations of privacy in the heroin by turning it
over to [another individual] and making no effort to follow [that
individual] after [he] drove away with the heroin in his trunk."
Id. at 1414.  The Ninth Circuit noted that the defendant had
relinquished control of the heroin and thus "abandoned any

14

reasonable expectation of privacy."  Id.  See also United States v. Dela Espriella, 781 F.2d 1432, 1437 (9th Cir. 1986) (concluding that "placing garbage for collection constitutes abandonment of the property").

5.  Tuua does not dispute that he abandoned his bag, arguing only that the abandonment of his backpack was involuntary because the police "illegally stopped him with no probable cause."  Motion at 7.

6.  "An abandonment must be voluntary, and an abandonment that results from Fourth Amendment violation cannot be voluntary."  United States v. Stephens, 206 F.3d 914, 917 (9th Cir. 2000) (quoting United States v. Austin, 66 F.3d 1115, 1118 (10th Cir. 1995)) (internal quotations omitted).  "There must be a nexus between the allegedly unlawful police conduct and abandonment of property if the challenged evidence is to be suppressed."  United States v. Gilman, 684 F.2d 616, 620 (9th Cir. 1982).  When there has been no police misconduct, the abandonment of property cannot be considered involuntary.  Id.

7.  To determine whether Tuua voluntarily abandoned the bag, the court must first determine whether HPD conducted a Fourth Amendment stop of Tuua.

8.  The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  See United

15

States v. Place, 462 U.S. 696, 701 (1983).  This right of personal security applies to a person on the streets.  See Terry v. Ohio, 392 U.S. 1, 8-9 (1968) (stating "[u]nquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street").  The Fourth Amendment does not forbid all searches and seizures, only unreasonable ones.  Id. at 9.

9.  Before considering whether a search or seizure is reasonable or unreasonable, the court must first find that a "search" or a "seizure" occurred.  Yin v. California, 95 F.3d 864, 874 (9th Cir. 1996).  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons."  Terry, 392 U.S. at 20 n. 16.  A consensual encounter with an officer is not a "seizure of a person" that implicates Fourth Amendment protections. An exchange is consensual if a reasonable person would feel free to walk away, decline to answer the officers' questions, or otherwise terminate the encounter. United States v. Mendenhall, 446 U.S. 544, 555 (1980).

10.  "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions."  Florida v. Bostick, 501 U.S. 429, 434 (1991).  See also United States v. Washington, 490 F.3d 765, 770 (9th Cir. 2007) ("No Fourth Amendment seizure occurs when a law enforcement

16

officer merely identifies himself and poses questions to a person if the person is willing to listen.").

11.   If a police encounter is not consensual, or if a consensual encounter at some point becomes nonconsensual, that encounter may be a seizure that implicates the Fourth Amendment. Terry, 392 U.S. at 16 ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person").  "[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." United States v. Mendenhall, 446 U.S. 544, 553 (1980).  See also Terry, 392 U.S. at 20 n.16.

12.   In Mendenhall, the Supreme Court concluded that federal agents did not conduct an investigatory stop when the plainclothes agents approached the defendant in an airport, identified themselves as federal agents, and asked to see the defendant's identification and airline ticket.  446 U.S. at 555; see also id. ("Such conduct without more, did not amount to an intrusion upon any constitutionally protected interest.").  Although the defendant stopped and turned over her identification and ticket, the Court concluded that the defendant had no "objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way."  Id.

13.   Similarly, the Ninth Circuit has concluded that
no investigatory stop occurred when a uniformed officer
approached a defendant in a stopped car to question the
defendant.  In United States v. Washington, 490 F.3d 765 (9th
Cir. 2007), the Ninth Circuit affirmed the district court's
conclusion that there was no investigatory stop.  The uniformed
police officer had stopped his car behind the defendant's parked
car and approached the defendant on foot to ask him some brief
questions.  The officer did not activate his sirens or lights and
did not brandish a weapon.  The Ninth Circuit affirmed the
district court's conclusion that "a reasonable person would have
felt free to terminate the encounter and leave."  Id. at 770.

14.   The circumstances of the case before this court
present even fewer Fourth Amendment concerns than were present in
Mendenhall and Washington.  The officers were not uniformed, they
did not brandish their weapons, they remained approximately
twenty feet from Tuua, and they say they said nothing to Tuua
until after he threw the bag.  Not only would a reasonable person
have felt free to leave under these circumstances, but, in this
case, Tuua actually did leave, continuing to walk away from the
officers at a quickened pace.  See California v. Hodari D., 499
U.S. 621, 629 (1991) ("In sum, assuming that [the police
officer's] pursuit in the present case constituted a 'show of
authority' enjoining [the defendant] to halt, since [the

18

defendant] did not comply with that injunction he was not seized until he was tackled.").

15.    Even if, as Green testified, the officers demanded that Tuua "come here" before he threw his bag into the stream, such verbal communication is not sufficient to constitute a Fourth Amendment stop.  That is because Tuua's freedom of movement was never restrained.  See Mendenhall, 446 U.S. at 553; Terry, 392 U.S. at 16 (describing a seizure by police as including both the accosting of a person and a restraint on the person's freedom to walk away).  Moreover, there is no evidence that Tuua knew that the officers, who were in plainclothes, were indeed police officers.  Cf. United States v. Kim, 25 F.3d 1426, 1430 n.1 (noting that a federal agent who "was not uniformed or visibly armed" was "unlikely . . . to emanate to any unduly intimidating extent the authority to detain the suspect, with or without his consent").  If three unknown men told one to "come here," it would be the unusual person who would feel compelled to obey.

16.    No Fourth Amendment stop requiring reasonable suspicion occurred before Tuua threw his bag into the stream. Because there was no police misconduct before Tuua abandoned the black bag, the abandonment was voluntary.  See Hodari, 499 U.S. at 629 (concluding that drugs had been voluntarily abandoned by the defendant when the police seized the defendant, without

19

probable cause, <u>after</u> the defendant tossed the drugs).  Tuua's motion to suppress evidence retrieved from the bag based on involuntary abandonment is denied.

17.  At the hearing on the present motion, Tuua's counsel was adamant that the evidence he sought to present was critical to Tuua's motion.  This court questioned that assertion but allowed Tuua to present evidence.  As it turns out, the differences between what the officers say occurred and what Green says occurred are immaterial.  Green's testimony did not indicate that Tuua's freedom of movement was restrained before he threw his bag into the stream.  Tuua never stopped moving and certainly moved freely enough to get rid of his bag, even in Green's account.  Nor does Green say the officers touched him, held him at gunpoint, or otherwise restrained him before he threw his bag into the stream.  He simply was not stopped and so voluntarily abandoned the bag, even accepting all of Green's testimony as true.

C.  HPD Had a Reasonable Suspicion That Justified
     Stopping Tuua After He Abandoned the Bag.

1. An officer may stop and briefly detain a person for investigative purposes if that officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot.  <u>Terry</u>, 392 U.S. at 30.  Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence."  <u>Illinois</u>

v. Wardlaw, 528 U.S. 119, 123 (2000).  "An officer may make an investigatory stop if he is aware of specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that the particular person detained is engaged in criminal activity."  United States v. Hernandez-Alvarado, 891 F.2d 1414, 1416 (9th Cir. 1989).

　　　　2.  In Terry, the Supreme Court described the stop justified by an officer's reasonable suspicion of criminal activity:

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled to the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

Terry, 392 U.S. at 30.

　　　　3.  The appropriate inquiry is "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Id. at 27.  In determining whether an officer acted reasonably under the circumstances, "due weight must be given, not to his inchoate and

21

unparticularized suspicion or 'hunch,' but to the specific
reasonable inferences which he is entitled to draw from the facts
in light of his experience."  Id.

4.   In Wardlaw, the Court concluded that the police
officer had a reasonable suspicion justifying a Terry stop.
Wardlaw involved police officers patrolling an area by car known
for "heavy narcotics trafficking."  They saw the defendant
standing next to a building holding an opaque bag.  Upon seeing
the police officers, the defendant fled.  One of the officers
then got out of the car, stopped the defendant, and conducted a
protective patdown for weapons.  Wardlaw, 528 U.S. at 122-23.
Although "[a]n individual's presence in an area of expected
criminal activity, standing alone, is not enough to support a
reasonable, particularized suspicion that the person is
committing a crime," the Court noted that "it was not merely
respondent's presence in an area of heavy narcotics trafficking
that aroused the officers' suspicion, but [also] his unprovoked
flight upon noticing the police."  Id. at 124.  The Court
concluded the police officer "was justified in suspecting that
[the defendant] was involved in criminal activity, and,
therefore, in investigating further."  Id. at 125.

5.   The facts of the present case are almost identical
to those in Wardlaw.  After Tuua abandoned the bag and walked
quickly away from Officers Sellers and Yamamoto even after they

asked him to stop, the officers had a reasonable suspicion justifying their stop of Tuua.  Seeing Tuua toss his bag into Nuuanu Stream also gave the officers enough information to suspect that Tuua had committed the petty misdemeanor of littering.  The court concludes that the officers were allowed to stop Tuua after he abandoned the bag.

> D.  <u>Tuua's Arrest Was Supported By Probable Cause.</u>

> 1.  "Probable cause to arrest depends 'upon whether, at the moment the arrest was made . . . the facts and circumstances within (the arresting officers') knowledge and of which they had reasonably trustworthy information was sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.'"  <u>Adams v. Williams</u>, 407 U.S. 143, 148 (1972) (quoting <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)).

> 2.  In <u>United States v. Potter</u>, 895 F.2d 1231 (9th Cir. 1990), the Ninth Circuit confronted a situation similar to the one before the court.  A police officer received a report of drug activity at a certain address.  When the officer arrived at the address, the defendant walked away "abruptly" from the police car toward a bush, where the defendant placed several items.  The police officer went to the bush and found three hypodermic syringes and a bag containing a druglike substance.  The Ninth

Circuit affirmed the district court's conclusion that there was probable cause to arrest the defendant.  Id. at 1234.

3.   The officers arrested Tuua after finding that the bag that he had been carrying contained a druglike substance, large amounts of currency, and a firearm.  These items gave HPD probable cause to arrest Tuua.  See, e.g., Rawlings v. Kentucky, 448 U.S. 98, 111 (1980) ("Once petitioner admitted ownership of the sizable quantity of drugs found in Cox's purse, the police clearly had probable cause to place petitioner under arrest."); United States v. Nava, 363 F.3d 942, 946 n.2 (9th Cir. 2004) (discovery of drugs in the gas tank of the defendant's car provided sufficient probable cause to arrest the defendant); United States v. Nohara, 3 F.3d 1239, 1242 (9th Cir. 1993) (affirming the district court's conclusion that there was probable cause to arrest the defendant when the agent observed the defendant holding a methamphetamine pipe containing a white residue, along with a black bag, in his hand).  The court concludes that, after recovering the abandoned bag, HPD had probable cause to arrest Tuua.

4.   Once again, the court concludes that the differences between what the officers testified to and what Green claimed are immaterial.  Even if the court accepted as true Green's account of an alleged beating, that would not render Tuua's arrest invalid.  The alleged beating occurred after Tuua

24

threw his bag into the stream, and it was what was in the bag
that gave the police probable cause to arrest Tuua.  As noted
above, the court is unpersuaded that a beating occurred but, even
if there was a beating, the beating could not have affected what
was in the bag.  It may give rise to civil remedies, but it does
not destroy the probable cause to arrest Tuua that arose even
before the alleged beating.  Nor does Green's testimony that Diaz
was paid to retrieve the bag destroy the probable cause to arrest
Tuua.  There is no evidence that Diaz or anyone else altered the
contents of Tuua's bag.  Tuua may be hoping that, if he makes
sufficient allegations, the court will apply a prophylactic
<u>Miranda</u>-like sanction in the form of excluding evidence flowing
from Tuua's arrest.  But Tuua shows no cause-and-effect
relationship between the alleged beating and the existence of
probable cause to arrest.  Suppressing evidence relating to an
arrest supported by probable cause would not deter a beating
occurring after police had probable cause to arrest.  Nor does
Tuua cite law supporting such a sanction.

       E.   <u>There was No Custodial Interrogation of Tuua.</u>

       1.  Tuua also moves to suppress the statements made to
the officers after his arrest on the ground that <u>Miranda</u> warnings
were not given.  Clearly, the law does support suppression of
evidence obtained in violation of <u>Miranda</u>.  The question
therefore is whether <u>Miranda</u> was violated here.

2.  <u>Miranda</u> warnings are required whenever a person is
subject to custodial interrogation.  Interrogation "refers not
only to express questioning, but also to any words or actions on
the part of the police that the police should know are reasonably
likely to elicit an incriminating response from the suspect."
<u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980).  An
incriminating response is "any response--whether inculpatory or
exculpatory--that the <u>prosecution</u> may seek to introduce at
trial."  <u>Id.</u> at n.5; <u>see</u> <u>also</u> <u>Miranda v. Arizona</u>, 384 U.S. 436,
476-77 (1966) (clarifying that statements introduced by the
prosecution solely for impeachment purposes are incriminating).

3.  Whether custodial interrogation has occurred is an
objective inquiry, and the subjective intent of the police,
though relevant, is not conclusive.  The focus is on the
defendant's perceptions.  <u>Innis</u>, 446 U.S. at 301.  Thus, the fact
that a question is objective, or was not "asked in an attempt to
elicit evidence of crime," does not establish that the
questioning was not an interrogation.  <u>United States v. Booth</u>,
669 F.2d 1231, 1238 (9th Cir. 1981).  "Even a relatively
innocuous question may, in light of the unusual susceptibility of
a particular subject, be reasonably likely to elicit an
incriminating response."  <u>Id.</u> (citing <u>Innis</u>, 446 U.S. at 302
n.8); <u>see</u> <u>also</u> <u>United States v. Henley</u>, 984 F.2d 1040, 1042 (9th
Cir. 1993)("When a police officer has reason to know that a

26

suspect's answer may incriminate him, however, even routine questioning may amount to interrogation.").

4. Because there is no evidence that the officers asked Tuua any questions at all after he was arrested, there was no custodial interrogation.  No Miranda warnings were required.  Tuua volunteered a discussion of another person who threw a bag into a stream and then "beat the case."  Tuua's motion to suppress that statement to HPD after his arrest is denied.

F.   The Search of Tuua Was A Valid Search Incident to Arrest.

1. "A 'search incident to arrest' is an exception to the general rule against warrantless searches."  United States v. Hudson, 100 F.3d 1409, 1419 (9th Cir. 1996).  The exception "permits law enforcement officers to conduct a warrantless search of a person who is arrested, and of his surrounding area, when the search is incident to arrest."  United States v. Smith, 389 F.3d 944, 950-51 (9th Cir. 2004).  "A legitimate 'search incident to arrest' is limited to the arrestee's person and to the area 'within his immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'"  Hudson, 100 F.3d at 1419.

2. The Supreme Court explained the basis for this exception in United States v. Robinson, 414 U.S. 218, 235 (1973):

> A police officer's determination as to how
> and where to search the person of a suspect
> whom he has arrested is necessarily a quick

ad hoc judgment which the Fourth Amendment
does not require to be broken down in each
instance into an analysis of each step in the
search.  The authority to search the person
incident to a lawful custodial arrest, while
based upon the need to disarm and to discover
evidence, does not depend on what a court may
later decide was the probability in a
particular arrest situation that weapons or
evidence would in fact be found upon the
person of the suspect.  A custodial arrest of
a suspect based on probable cause is a
reasonable intrusion under the Fourth
Amendment; that intrusion being lawful, a
search incident to the arrest requires no
additional justification.  It is the fact of
the lawful arrest which establishes the
authority to search, and we hold that in the
case of a lawful custodial arrest a full
search of the person is not only an exception
to the warrant requirement of the Fourth
Amendment, but is also a 'reasonable' search
under that Amendment.

3.  Stated differently, searches incident to custodial

arrests are "justified by the reasonableness of searching for

weapons, instruments of escape, and evidence of crime when a

person is taken into official custody and lawfully detained."

Edwards, 415 U.S. at 802-03; see Hudson, 100 F.3d at 1419 ("The

justification for permitting a warrantless search is the 'need of

law enforcement officers to seize weapons or other things which

might be used to assault an officer or effect an escape, as well

as the need to prevent the loss or destruction of evidence.'").

4.  After arresting Tuua based on probable cause, HPD

conducted a valid search of his person incident to his arrest.

28

Accordingly, Tuua's motion to suppress the evidence recovered from that search is denied.

IV.      <u>CONCLUSION.</u>

        For the foregoing reasons, Tuua's motion to dismiss or to suppress is denied.


        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, June 19, 2008.




         <u>/s/ Susan Oki Mollway</u>
         Susan Oki Mollway
         United States District Judge


<u>**United States v. Mario Tuua**</u>; CR. No. 08-00159 SOM; ORDER DENYING DEFENDANT
MARIO TUUA'S MOTION TO DISMISS INDICTMENT OR, IN THE ALTERNATIVE, MOTION TO
SUPPRESS EVIDENCE.